Filed 4/11/13  P. v. Kundrat CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>KADE KUNDRAT,<br><br>　　　Defendant and Appellant. | D060318<br><br><br>(Super. Ct. No. SCN264386) |

APPEAL from a judgment of the Superior Court of San Diego County, K. Michael Kirkman, Judge.  Affirmed.


Kade Kundrat appeals a judgment following his jury conviction of first degree murder (Pen. Code, § 187, subd. (a)).[1]  On appeal, he contends the evidence is insufficient to support the jury's findings that: (1) he acted with an intent to kill; (2) he acted with premeditation and deliberation; (3) he did not act in a heat of passion or

---

[1]    All statutory references are to the Penal Code.

sudden quarrel; and (4) he did not act in actual, but unreasonable, self-defense (i.e., imperfect self-defense).

FACTUAL AND PROCEDURAL BACKGROUND

On July 12, 2009, Adam Schmidt (Schmidt), the younger brother of Kundrat's ex-boyfriend, Joshua Schmidt (Joshua), was staying at Kundrat's Oceanside apartment for a few days. Kundrat lived there with his infant son, K. Kundrat was friends with Nicole Munoz and her fiancé, David Jacobson.

Between 8:30 p.m. and 10:00 p.m., Schmidt went with Jacobson to meet Munoz at the train station. After meeting her, Jacobson and Schmidt bought a bottle of vodka and then all three headed to Kundrat's apartment. Kundrat, his infant son, and Kalvin Ratsch were there when they arrived. Ratsch was staying at the apartment that weekend. Schmidt, Jacobson and Munoz drank vodka and smoked marijuana. Jacobson and Munoz argued about her use of her cell phone to try to get drugs. Jacobson left the apartment. Munoz then left to find drugs at someone else's house. When she returned, Jacobson was not there. She left to look for him and found him at a bar. Jacobson met a friend, Buddah, and all three went back to Kundrat's apartment. Ratsch was sleeping on the floor, Kundrat was sleeping in the bedroom with his son, and Schmidt was trying to sleep on the couch.

Munoz and Jacobson began arguing again because she wanted to do drugs and he did not want her to. Jacobson "popped" her on the back of the head. She grabbed him, threw him to the floor, and began choking him. When she let Jacobson go, he grabbed her phone and tried to leave. She wrestled him to the floor again, grabbed her phone, and

2

then went into Kundrat's bedroom because Jacobson was scaring her. Jacobson and Schmidt followed her into the bedroom. Munoz told Kundrat she was afraid of Jacobson because he hit her and wanted Jacobson to leave the apartment, and Kundrat told Jacobson to leave. He refused and told Schmidt to leave. Schmidt stated he was staying there and didn't have to leave. Jacobson punched Schmidt in the nose, knocking him to the floor. When he tried to jump on Schmidt, Kundrat pulled him off. Kundrat told Jacobson he had to leave.[2] Either Jacobson or Buddah kicked Ratsch, who was lying on the floor, and took his cell phone.[3] Jacobson and Buddah left together. After they left, Kundrat stated: "You don't hit my boyfriend's little brother in my house in front of my 18-month-old son." Kundrat's son was awake and crying. Schmidt's nose was bleeding. Kundrat appeared distraught that Schmidt's nose was broken. Schmidt held a towel to his bloody nose, and tried to call his brother (Joshua), which upset Kundrat, but Joshua did not answer his phone.

At about 1:50 a.m., Jacobson called Munoz and tried to apologize. Munoz refused to accept his apology and hung up on him. Kundrat asked her to call Jacobson back and see if he was still there. When she called, Guitar Joe, who lived five minutes away, answered the phone and said Jacobson had left. Munoz told Kundrat that Jacobson was not there and he should not bother looking for him.

---

[2]	At trial, Munoz testified that Kundrat did not use force to make Jacobson leave. In contrast, Ratsch testified Kundrat held Jacobson by the shirt and led him to the door.

[3]	Ratsch admitted that at the preliminary hearing he testified it was Jacobson who kicked him and took his phone.

Kundrat left the apartment to look for Jacobson, stating he would be right back. He told Munoz to keep the door locked and not to open it for anyone. Kundrat seemed very tense, angry, and upset. After he left, Guitar Joe called Munoz and asked her to tell Jacobson that he left with his (Guitar Joe's) marijuana pipe. Kundrat returned about five to 10 minutes later. He went to the kitchen, rattled some silverware, grabbed something off the counter (presumably a knife), and rushed back to the front door, stating he would be right back. Ratsch asked him about his phone and Kundrat replied, "Fuck your Blackberry."

At about 2:00 a.m., Erica Valenzuela-Greb and her husband, Shane Greb, who lived in apartment 18 in Kundrat's apartment building, were awakened by a loud scream.[4] Erica looked out the window and saw someone sitting against the staircase.

Between five and 15 minutes after he left, Kundrat returned to his apartment, told the others not to look, and turned off all the lights. He went straight to the kitchen, ran water, washed something, and placed something in a plastic bag. When they asked what was happening, Kundrat told them to "[s]hut the fuck up." He ordered them to go into the bedroom and stated: "Nobody is leaving, not even to take a shit." Kundrat, Munoz, Schmidt, and Ratsch went into the bedroom where K. was and Munoz closed its windows and curtains. Kundrat told everyone to give him their cell phones. Munoz and Schmidt handed him their phones and he removed their batteries. Kundrat then changed his

---

4       Schmidt also heard a scream at about this time.

clothes in the dark. When Munoz asked what happened, Kundrat told her nothing happened.

Kundrat appeared distraught and upset and was chain-smoking. Kundrat told Munoz that she "better give up the pussy or the mouth" because he was "going to be going away for a long time." He told Schmidt that he was safe now and was "straight" for getting hit. He told Munoz that she was "straight" for Jacobson's putting hands on her. He told Ratsch that he could not find his phone, but he was "straight" for that. Kundrat said he had "hurt that kid" and they did not have to worry about getting slapped or punched anymore. He told Ratsch to "F" his military career and that "[e]verybody's lives are at risk." Kundrat stated that if anyone asked, he was with his child all night.

At about 2:30 a.m., Dawn MacDonald, who lived in apartment 20 in Kundrat's apartment building, left her apartment with her mother to go to her car. She saw blood running into the street from the driveway in front of the stairs. She then saw Jacobson's body and called 911.

Later that night, Kundrat called Joshua and asked him to pick up K. At some point, Kundrat saw police outside and stated he would not be able to get K. and Schmidt out of the apartment. At about 3:40 a.m., Kundrat opened the apartment door and saw Oceanside Police Officer Jeffrey Killion outside. Killion told Kundrat that detectives needed to talk to residents before they left. When Killion asked Kundrat for identification, Kundrat pulled his wallet out of his waistband and handed it to Killion. Killion asked Kundrat to take his identification out of his wallet and hand it to him. Kundrat's hands were shaking as he complied.

5

Police found Jacobson's body seated next to a staircase. A pipe and two cell phones, one of which was Ratsch's, were found in his pockets. A pool of blood surrounded the body and there also was a large amount of blood outside the laundry room. A trail of blood was found in the interior hallway of the apartment building. A subsequent examination of Jacobson's body showed he had sustained four stab wounds, each of which was significant or life-threatening. The first stab wound was three inches deep and to the back of the right side of his neck. The second stab wound was four and three-quarter inches deep and was just below his left armpit on the left side of his chest. The third stab wound was about the same depth and was just below the second one on the left side of his chest. The fourth stab wound was also about the same depth and was to the left side of his chest behind the third stab wound. The cause of Jacobson's death was determined to be stab wounds to the thorax and neck. He died within seconds to a few minutes after sustaining those injuries. His blood alcohol content was 0.18 percent and tests showed the presence of cannabinoids (i.e., marijuana) in his system.

A search by police of Kundrat's apartment found a pillowcase with a significant amount of blood on it, blood on the bedroom's wall, and a shoe with apparent blood on it. In the kitchen, police found a few droplets of blood and a bloodstained hand towel near the sink.[5] A knife was found in the sink. The knife was one and one-half inches wide, six and three-quarter inches long, with a single sharp edge, and could have been used to

---

[5]     Subsequent tests showed the blood droplets and blood on the towel matched Schmidt's DNA.

inflict Jacobson's injuries. A folding knife was found on the floor under a storage cabinet in the kitchen. Because the medical examiner was unable to open it, no conclusion was made whether it could have caused Jacobson's injuries.[6] Jacobson's blood was on clothing found in Kundrat's apartment, including a black T-shirt, a pair of shorts, and a pair of shoes. Kundrat's DNA was found on those shoes and he could not be excluded as a contributor to the DNA found on the shorts. No blood or DNA was found on the blade of the knife found in the sink or on the folding knife found under the cabinet.

An information charged Kundrat with first degree murder (§ 187, subd. (a)) and alleged that in committing that offense he personally used a deadly weapon, a knife (§§ 12022, subd. (b)(1)), 1192.7, subd. (c)(23)). It also alleged he had four prior prison convictions (§§ 667.5, subd. (b), 668) and seven convictions that made him ineligible for probation (§ 1203, subd. (e)(4)).

At trial, the prosecution presented evidence substantially as described above. In his defense, Kundrat testified that he had a drink or two the afternoon of July 12, 2009, but was not intoxicated. Apparently that evening, he was sleeping with his son and awoke to find Jacobson, Munoz, and Schmidt in his bedroom. Jacobson and Munoz were arguing. Jacobson punched Schmidt, who curled up into a ball. Although Schmidt was crying, Kundrat did not feel any responsibility to protect him because he was a grown man who could take care of himself. He also did not feel responsible to take care of

---

6    At trial, a police detective opened the folding knife and measured its blade as four and three-quarter inches long. Its width was one and two-tenths inches. Before trial, he had been unable to open it and thought it was rusted shut.

Munoz.  Kundrat picked up his crying son and asked Jacobson to leave.  As Kundrat walked down a hallway, he saw a bald Hispanic man (presumably Buddah) he did not know.  He was angry someone had brought a stranger into his home and told him to get out.  Kundrat begged Jacobson to leave.  Jacobson kicked Ratsch and took his phone and then he and the stranger left the apartment.

Later, Kundrat left the apartment to find Jacobson and tell him not to return to the apartment until he was sober.  He took a knife with him.  Unsuccessful in finding Jacobson, Kundrat returned home.  When Munoz finished a call on her cell phone, she told Kundrat that Jacobson was at Guitar Joe's.  Kundrat told her to tell Jacobson to stay there.  When Guitar Joe called and said Jacobson had left with his pipe, Kundrat believed that meant Jacobson was on his way back to the apartment.  Kundrat left the apartment, hoping to convince Jacobson to stay at Guitar Joe's for the rest of the night.  He took his folding knife, in its opened position, with him because he was worried about Jacobson's friend, "the Mexican dude with the bald head."  Kundrat walked down the stairs in the apartment building, turned, and then saw Jacobson rushing at him.  He saw Jacobson's fist coming toward him and he thought he was about to get hit or stabbed.  In a split-second decision, Kundrat reacted by stabbing Jacobson twice.  He thought his knife went only part of the way into Jacobson.  Although Kundrat thought Jacobson was trying to stab him, he did not see a knife in his hand.  Kundrat testified that he did not intend to kill Jacobson when he left his apartment to look for him.  Kundrat did not think he killed Jacobson, but only "nicked" him.  Kundrat saw blood on his fingers and on the ground outside the laundry room.

Kundrat returned to his apartment, yelled for someone to turn off the lights, and Munoz did so. Kundrat went to the kitchen and washed off his hands and the folding knife. He then hid the knife under the closet because he knew that, as a felon, he was not allowed to have a folding knife of that size. Kundrat told everyone to keep quiet, turn out the lights, and close the windows so no one would know anyone was home. Although he told everyone to go into the bedroom, he did not prevent them from leaving the bedroom or calling police. He told them he "might be gone for like five years." He told Schmidt that he "hurt that kid." He borrowed Munoz's cell phone and called Joshua to have him pick up K. and Schmidt. Kundrat heard voices outside, saw reflections of red and blue lights, and thought Jacobson had called police. Early that morning (July 13, 2009), Kundrat opened his door to take K. to Joshua, who was at the beach. He saw the police and ultimately was taken to the police station and interviewed. However, during the interview Kundrat did not tell police he was afraid of Jacobson, Jacobson charged at him, or that he stabbed Jacobson.

Kundrat testified that he remembered stabbing Jacobson only twice in his side. He did not remember stabbing him in the back of the neck or the third time in his torso. Although Kundrat was larger than Jacobson, he was aware of Jacobson's reputation as a good fighter. Kundrat denied he was angry at Jacobson that night, but was "a little upset about the whole ordeal, in general."

In rebuttal, the prosecution presented the testimony of a police detective who testified that during his interview of Kundrat on July 13, 2009, Kundrat never told him he was afraid of Jacobson, Jacobson lunged at him, he feared for his life, or that he was

9

afraid of Jacobson's friend who was in the apartment that night (presumably Buddah).

Kundrat never told him he had stabbed Jacobson.

The jury found Kundrat guilty of first degree murder and found true the allegation he personally used a deadly weapon in committing that offense. In a separate bench trial, the trial court found true the prior conviction allegations. The court sentenced Kundrat to an indeterminate term of 25 years to life in prison for the first degree murder offense, plus a total determinate term of five years for the enhancements, for a total term of 30 years to life in prison.[7] Kundrat timely filed a notice of appeal.

DISCUSSION

I

*Substantial Evidence Standard of Review*

When a defendant challenges a criminal conviction on appeal based on a claim of insufficiency of the evidence, "the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--that is, evidence that is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically

_____

[7]     The five-year total determinate term consisted of one year for personal use of a deadly weapon and four 1-year terms for each of his four prior prison terms.

10

impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The substantial evidence standard of review involves two steps. "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine whether the evidence thus marshaled is substantial. While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns. omitted.) "[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

11

The standard of review is the same in cases in which the prosecution relied primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.) In applying the substantial evidence standard of review to cases primarily involving circumstantial evidence, *Bean* stated: "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id*. at pp. 932-933.) "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." (*People v. Pierce* (1979) 24 Cal.3d 199, 210.)

II

*Substantial Evidence of Malice Aforethought*

Kundrat contends his conviction of first degree murder must be reversed because the evidence is insufficient to support the jury's finding he killed Jacobson with malice aforethought.

A

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be either express or implied. (§ 188; *People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice is express when there is an unlawful intent to kill. (§ 188

12

[defining express malice as "a deliberate intention unlawfully to take away the life of a fellow creature"]; *People v. Blakeley* (2000) 23 Cal.4th 82, 87.)  "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.]  In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another--no more, and no less."  (*Knoller*, at p. 143.)

B

Because the jury found Kundrat guilty of willful, premeditated, and deliberate murder, it necessarily found he killed Jacobson with an intent to kill him.  As noted above, an intent to kill constitutes express malice.  We conclude there is substantial evidence to support the jury's finding that he had the intent to kill Jacobson.  Because there rarely is direct evidence of a defendant's intent, a defendant's intent to kill may be inferred from his or her acts and the circumstances of the crime.  (*People v. Smith* (2005) 37 Cal.4th 733, 741.)  The record supports a reasonable inference that Kundrat stabbed Jacobson four times with a knife and killed him.  Kundrat stabbed Jacobson once in the back of his neck and three times on the left side of his chest below his armpit.  Each of the four stab wounds was at least three inches deep and was life-threatening.  Based on the nature of the knife attack and location and depth of each stab wound, there is substantial evidence to support the jury's finding that Kundrat stabbed Jacobson with the intent to kill him, thereby satisfying the malice requirement for murder.  (Cf. *People v. Bolden* (2002) 29 Cal.4th 515, 560-561 [single stab wound, five to six inches deep, to

13

victim's back that penetrated victim's lungs and spleen supported inference that defendant had an intent to kill]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [defendant stabbed victim in abdomen, an extremely vulnerable area, supporting inference defendant had a specific intent to kill].)  To the extent Kundrat argues there is substantial evidence that would have supported a contrary finding (i.e., that he did not have an intent to kill), he misconstrues and/or misapplies the substantial evidence standard of review.[8]

III

*Substantial Evidence of Premeditation and Deliberation*

Kundrat contends his conviction of first degree murder must be reversed because the evidence is insufficient to support the jury's finding he killed Jacobson with premeditation and deliberation.

A

Murder that is willful, deliberate, and premeditated is murder of the first degree. (§§ 187, subd. (a), 189.)  "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.  [Citations.]  However, the requisite reflection need not span a specific or extended period of time.  ' " 'Thoughts may follow each other with great rapidity and

_____

[8]     Kundrat argues: "There was . . . substantial evidence that [he] did not intend to kill [Jacobson]."  However, in applying the substantial evidence standard of review on appeal, we do not look for substantial evidence to support a finding contrary to the verdict, but rather look for substantial evidence to support the verdict.  (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11; *People v. Johnson*, *supra*, 26 Cal.3d at p. 578; *People v. Bean*, *supra*, 46 Cal.3d at pp. 932-933; *Bowers v. Bernards*, *supra*, 150 Cal.App.3d at pp. 873-874.)

14

cold, calculated judgment may be arrived at quickly . . . .' " ' " (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)  Alternatively stated, " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.)

In reviewing the evidence to support a finding of premeditated and deliberate murder, "[a]ppellate courts typically rely on three kinds of evidence . . . : motive, planning activity, and manner of killing.  [Citations.]  These factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.  [Citation.]  However, '[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.'  [Citation.]  In conducting this analysis, we draw all reasonable inferences necessary to support the judgment." (*People v. Stitely*, *supra*, 35 Cal.4th at p. 543.)  Those three factors "are not exclusive, nor are they invariably determinative." (*People v. Combs* (2004) 34 Cal.4th 821, 850.)

B

Based on our review of the whole record, we conclude there is substantial evidence to support the jury's finding that Kundrat's intentional killing of Jacobson was premeditated and deliberate.  We conclude that finding is supported by evidence of Kundrat's motive, planning activity, and manner of killing.  The jury could reasonably infer from the evidence that Kundrat had a motive to kill Jacobson.  The jury could infer Kundrat was angry because Jacobson: (1) argued with and hit Munoz; (2) awoke him and his baby causing his baby (K.) to cry; (3) punched Schmidt in the nose; (4) brought a

15

stranger (i.e., Buddah) into his apartment; and (5) kicked Ratsch and took his phone. Based on that anger toward Jacobson, the jury could infer Kundrat wanted revenge and retaliated against Jacobson by stabbing and killing him, thereby, in Kundrat's mind, making Munoz, Schmidt, and Ratsch "straight" for what Jacobson did to them. There is evidence showing Kundrat had a motive to kill Jacobson.

Second, there is also evidence Kundrat planned the killing in advance. He armed himself with an open knife when he went left the apartment to find Jacobson. Although Kundrat testified he took the knife because he was afraid of Jacobson's friend (i.e., Buddah), the jury could properly reject that testimony and, instead, reasonably infer that Kundrat took the knife with the plan to use it to stab and kill Jacobson. (*People v. Steele* (2002) 27 Cal.4th 1230, 1250 ["As to planning, the jury could infer that defendant carried the fatal knife into the victim's home in his pocket, which makes it 'reasonable to infer that he considered the possibility of homicide from the outset.' "]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082 [planning was shown by defendant's arming himself with two concealed and loaded handguns]; *People v. Miranda* (1987) 44 Cal.3d 57, 87 [defendant's bringing of loaded gun and shortly thereafter using it to kill victim "reasonably suggests [he] considered the possibility of murder in advance"]; *People v. Romero* (2008) 44 Cal.4th 386, 401 [planning was shown by defendant's bringing of gun to store and shooting victim in back of head].)

Third, evidence of the manner in which Kundrat killed Jacobson supports a reasonable inference he did so with premeditation and deliberation. Kundrat stabbed him four times. He stabbed him once in the back of the neck and three times in the torso. All

16

of the stab wounds were life-threatening.  Based on the location and depth of the stab wounds, the jury could reasonably infer Kundrat carefully thought about and reflected on his plan to kill Jacobson, even if only for a brief time, and then deliberately carried out his plan by fatally stabbing Jacobson multiple times.

Based on the evidence of Kundrat's preexisting motive, planning activity, and manner of killing, as well as other evidence in the record, we conclude there is substantial evidence to support the jury's finding that Kundrat killed Jacobson with premeditation and deliberation.  (*People v. Stitely*, *supra*, 35 Cal.4th at p. 543; *People v. Mayfield*, *supra*, 14 Cal.4th at p. 767.)  To the extent Kundrat argues there is substantial evidence that would have supported a contrary finding (i.e., that he did not kill Jacobson with premeditation and deliberation), he misconstrues and/or misapplies the substantial evidence standard of appellate review.

IV

*Substantial Evidence to Support Finding Killing Was Not Done*
*in a Heat of Passion or Sudden Quarrel*

Kundrat contends his conviction of first degree murder must be reversed because the evidence is insufficient to support the jury's finding that his killing of Jacobson was not done in a heat of passion or sudden quarrel and therefore was not, at most, voluntary manslaughter.

A

Manslaughter is "the unlawful killing of a human being without malice."  (§ 192.) "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly

17

defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"-- the unreasonable but good faith belief in having to act in self-defense [citations].' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) In proving a defendant had the malice required for murder, the prosecution has the burden to prove beyond a reasonable doubt that the killing was not done in a heat of passion or sudden quarrel or in imperfect self-defense. (*People v. Rios* (2000) 23 Cal.4th 450, 454, 462.)

Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the "factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

The heat of passion theory of manslaughter has both an objective and a subjective component. (*People v. Moye* (2009) 47 Cal.4th 537, 549; *People v. Wickersham* (1982)

18

32 Cal.3d 307, 326-327.) The objective component is set forth in *Lee*, quoted above. The subjective component requires the defendant to have killed while under the actual influence of a strong passion induced by the victim's provocative conduct. (*Moye*, at p. 550.) No specific type of provocation is required for heat of passion. (*Wickersham*, at p. 326.) The passion need not be anger or rage, but can "be any '[v]iolent, intense, high-wrought or enthusiastic emotion.' " (*Id*. at p. 327.) Furthermore, "if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ." (*Ibid*.) Alternatively stated, " ' "[i]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." ' " (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

B

Although Kundrat asserts the evidence is insufficient to support the jury's finding he did not kill Jacobson in a heat of passion or sudden quarrel, his appellant's opening brief does not contain any substantive analysis applying the law to the evidence in this case in support of his assertion.[9] At most, Kundrat makes the conclusory argument that "with substantial evidence the record establishes that [his] actions were instinctive [and] rash." Accordingly, he has waived or forfeited on appeal any contention that the evidence is insufficient to support the jury's finding that he did not act in a heat of passion or sudden quarrel. (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 [where point is asserted

---

[9] Kundrat did not file a reply brief.

without any substantive argument, it is deemed to be without foundation and requires no discussion], disapproved on another ground by *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 [if appellate contentions are not supported by substantive argument, the issues are considered waived]; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 [same]; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 [contention was deemed waived because "[a]ppellant did not formulate a coherent legal argument nor did she cite any supporting authority"]; *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301, fn. 2 ["[t]he dearth of true legal analysis in her appellate briefs amounts to a waiver of the [contention] and we treat it as such"]; *Bayside Auto & Truck Sales, Inc. v. Department of Transportation* (1993) 21 Cal.App.4th 561, 571.)

In any event, assuming arguendo Kundrat has not waived this contention, we conclude his appellate argument regarding heat of passion or sudden quarrel is incoherent, incomprehensible, vague and/or conclusory and therefore he has *not* carried his burden on appeal to present *persuasive* substantive argument and analysis showing reversible error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971; *Paterno v. State of California* (1999) 74 Cal App.4th 68, 105 [conclusory claims did not persuade appellate court].)

Furthermore, our review of the record shows there is substantial evidence to support the jury's finding that Kundrat did not kill Jacobson in a heat of passion or sudden quarrel. First, there is substantial evidence to support the jury's finding that

20

Jacobson did not engage in any conduct sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*People v. Lee*, *supra*, 20 Cal.4th at p. 59.) Alternatively stated, the record supports the finding that Jacobson did not engage in any conduct, and Kundrat did not reasonably believe he engaged in any conduct, that would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from that passion rather than from judgment. (*Ibid*.) The jury could reasonably find that Jacobson's earlier actions that night (i.e., arguing with and hitting Munoz, waking up Kundrat and his baby, punching Schmidt, and kicking Ratsch and taking his phone) were insufficient for an ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and stab and kill Jacobson from passion rather than from judgment. Furthermore, there is substantial evidence to support a finding by the jury that, even if Jacobson's conduct were initially sufficient to cause a reasonable person to act rashly, the period of time between that conduct and Kundrat's killing of Jacobson was sufficient for the passions of a reasonable person of average disposition to cool and therefore not act rashly and without deliberation. (*People v. Avila*, *supra*, 46 Cal.4th at p. 705.)

Although the record does not specifically establish how much time elapsed between Jacobson's conduct and Kundrat's stabbing of him, the jury could estimate, based on the sequence of events, that the separation in time between those events was at least 20 to 30 minutes and probably much greater. The evidence presented by the prosecution supported the finding that Kundrat armed himself with a knife, went looking for

21

Jacobson, and stabbed him four times when he found him, showing Kundrat acted with reflection and deliberation and not in a heat of passion. Because there is substantial evidence to support the jury's finding that the objective component was not satisfied, there is substantial evidence to support the jury's finding that Kundrat did not kill Jacobson in a heat of passion or sudden quarrel. We need not address whether there is substantial evidence to support an alternative finding by the jury on the subjective component, i.e., that Kundrat did not kill Jacobson while under the *actual* influence of a strong passion induced by his provocative conduct.[10] (*People v. Moye*, *supra*, 47 Cal.4th at p. 550.)

V

*Substantial Evidence to Support Finding Killing*
*Was Not Done in Imperfect Self-Defense*

Kundrat contends his conviction of first degree murder must be reversed because the evidence is insufficient to support the jury's finding that his killing of Jacobson was not done in imperfect (i.e., actual, but unreasonable) self-defense and therefore was not, at most, voluntary manslaughter.

---

[10] Were we to address the evidence on the subjective component of heat of passion, we would conclude there is ample evidence to support a finding Kundrat did not stab and kill Jacobson while actually under the influence of passion provoked by him. Kundrat testified at trial that when he left the apartment to find Jacobson, he intended only to talk to him and ask him to stay away from the apartment until he was sober. Kundrat did not testify at trial that he acted under the influence of any passion, but instead that he reacted in self-defense when he saw Jacobson rushing at him.

22

A

"When the defendant killed in the actual but unreasonable belief that he or she was in imminent danger of death or great bodily injury, this is termed 'imperfect self-defense,' and the killing is reduced from murder to voluntary manslaughter." (*People v. Lewis* (2001) 25 Cal.4th 610, 645; see also *In re Christian S.* (1994) 7 Cal.4th 768, 771.) The defendant must fear an imminent peril that must be immediately dealt with. (*In re Christian S.*, at p. 783.) In proving a defendant had the malice required for murder, the prosecution has the burden to prove beyond a reasonable doubt that the killing was not done in imperfect self-defense. (*People v. Rios*, *supra*, 23 Cal.4th at pp. 454, 462.)

B

Based on our review of the record, we conclude there is substantial evidence to support the jury's finding that Kundrat did not act in imperfect self-defense when he killed Jacobson. There is evidence to support a reasonable inference by the jury that Kundrat was angry at Jacobson, armed himself with a knife, and went looking for him with the intent to stab and kill him. When Kundrat found Jacobson, he stabbed him four times, causing wounds that were deep and life-threatening. He stabbed Jacobson once in the back of the neck and three times on the left side of his torso. Accordingly, the jury could reasonably infer Kundrat acted with malice and not in the actual, but unreasonable, belief that he was in imminent danger of death or great bodily injury.

It was within the jury's province to weigh the credibility of the witnesses and the strength of the evidence. In so doing, the jury reasonably rejected Kundrat's testimony at trial that he, in effect, honestly believed he was in imminent danger of death or great

23

bodily injury. Furthermore, the evidence supporting his claim of imperfect self-defense was weak, at best. Although Kundrat claimed he saw Jacobson rushing at him with his arm raised, Kundrat did not see any weapon in his hand. To the extent Kundrat claimed he was afraid of Jacobson's friend (Buddah), there was no evidence Kundrat saw Buddah at the crime scene or believed he was nearby and posed an imminent threat to him. Also, based on the location and nature of the four stab wounds, the jury could reasonably infer Kundrat did not stab Jacobson in actual, but unreasonable, self-defense, but rather intentionally killed him with malice, premeditation, and deliberation. Based on the whole record, we conclude there is substantial evidence to support the jury's finding that Kundrat did not kill Jacobson in the actual, but unreasonable, belief in the need to defend himself from an imminent danger of death or great bodily injury. To the extent Kundrat argues there is substantial evidence that would have supported a contrary finding (i.e., that he acted in imperfect self-defense), he misconstrues and/or misapplies the substantial evidence standard of review.

## DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.

24